UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| JONATHAN ACOSTA, JEANINE CALKIN, LEONARDO A. COIE, JR., GAYLE GOLDIN, TIARA MACK, and JENNIFER ROURKE, <br><br> Plaintiffs, <br><br> v. <br><br> JUAN PABLO RESTREPO, BRYANT A. ESTRADA, and EMMANUEL L. LYTE, solely in their official capacity as members of the Central Falls Board of Canvassers; ALBERTO DEBURGOS, solely in his official capacity as Clerk of the Central Falls Board of Canvassers; JANICE PUCCI, GARY E. WYNKOOP, and NICHOLAS BIANCO, solely in their official capacity as members of the North Providence Board of Canvassers; DENISE A. VASQUES, solely in her official capacity as the Clerk of the North Providence Board of Canvassers; MARIA M. PAVAO, ROBERT W. CASTLE, and EDWARD CANTONE, JR., solely in their official capacity as members of the Pawtucket Board of Canvassers; KENNETH MCGILL, solely in his official capacity as Registrar for the Pawtucket Board of Canvassers; CLAUDIA J. HAUGEN, RENAY BROOKS OMISORE, and MERCEDES BERNAL, solely in their official capacity as members of the | C.A. No. 1:20-CV-00262-MSM-LDA |

1

| | |
|---|---|
| Providence Board of Canvassers; <br> KATHY PLACENCIA, solely in her <br> official capacity as Administrator of <br> Elections for the City of Providence; <br> EDWARD MURPHY, SUSAN <br> ABRAMSON, and DONNA J. <br> MCDONALD, solely in their <br> official capacity as members of the <br> Warwick Board of Canvassers; <br> DOROTHY MCCARTHY, solely in her <br> official capacity as Director of <br> Elections for the City of Warwick; <br> NELLIE GORBEA, solely in her <br> capacity as Rhode Island Secretary of <br> State; DIANE C. MEDEROS, <br> STEPHEN P. ERICKSON, <br> JENNIFER L. JOHNSON, <br> RICHARD H. PIERCE, <br> ISADORE S. RAMOS, DAVID H. <br> SHOLES, and WILLIAM E. WEST, <br> solely in their official capacity as <br> members of the Rhode Island Board of <br> Elections; and, PETER NERONHA, <br> solely in his official capacity as <br> Attorney General of the State of <br> Rhode Island, <br><br>     Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## MEMORANDUM AND ORDER

Mary S. McElroy, United States District Judge.

Before the Court is the plaintiffs' Emergency Motion for Injunctive Relief (ECF No.2), seeking to modify the Rhode Island statutory ballot qualification process due to the extraordinary circumstances wrought by the ongoing COVID-19 pandemic. The Rhode Island ballot qualification process for the state offices at issue in this matter requires in-person solicitation and receipt of signatures, an in-person witness,

2

and use of a common petition form upon which qualified voters sign. *See* R.I.G.L. §§ 17-14-8, 17-14-10.

As set forth below, because the Court finds that the plaintiffs have met the factors necessary for the issuance of a preliminary injunction, the Court will grant the plaintiffs' Motion to the extent that it seeks a one-time cessation of the in-person signature requirement and instead calls for the collection of signatures electronically.

## I.   BACKGROUND

### A. The Parties

The six plaintiffs, Jonathan Acosta, Jeanine Calkin, Leonardo A. Cioe, Jr., Gayle Goldin, Tiara Mack, and Jennifer Rourke, are all candidates for the Rhode Island Senate in the upcoming 2020 election. The plaintiffs have brought suit against the members of the Boards of Canvassers in the cities or towns that are included in the Senate Districts for which they seek office; the members of the Rhode Island Board of Elections; the Rhode Island Secretary of State; and the Rhode Island Attorney General.

### B. The Candidate Nomination Process For The Rhode Island Senate

The Rhode Island candidate nomination process for the state Senate is governed by R.I.G.L. § 17-14-1 *et seq.* First, a candidate must file a declaration of candidacy during "the last consecutive Monday, Tuesday, and Wednesday in June."[1] R.I.G.L § 17-14-1. Then, the local boards of canvassers "personally issu[e]" nomination papers to each candidate for the General Assembly. R.I.G.L. 17-14-4.

---

[1] For 2020, these three days fall on June 22, 23, and 24.

The candidates are required to obtain the signatures of 100 registered voters who reside in the candidate's senatorial district. R.I.G.L. § 17-14-7. The solicitation, collection, and witnessing of signatures must take place in person. That is, the nomination process requires the collection of "wet" signatures from each person executing a nomination petition, coupled with an attestation from a witness who personally observed the signing of the petition. R.I.G.L. § 17-14-8; § 17-14-10.

The plaintiffs explain in their verified Complaint that solicitation of signatures requires contact with far more people than the number required to be collected for the nomination (100) because persons soliciting signatures must "engage in a colloquy with prospective signers regarding their eligibility to sign, and only collect signatures from those who are eligible to sign." (ECF No. 1 ¶ 30.) Further, candidates often collect far more signatures than required to mitigate against the disallowance of certain signatures.[2] *Id.* ¶ 31.

Submission of completed nomination papers is made "in hand" at the local board of canvassers office. (ECF No. 1 ¶ 34.)

## C. The COVID-19 Pandemic

Since March 2020, the COVID-19 pandemic has affected all aspects of daily life in Rhode Island, throughout the country, and most of the world. This Court previously has observed that "[t]he Center for Disease Control, the government agency with the most expertise and authority in the area of infectious disease, has

---

[2] The "validity or authenticity of any signature" may be challenged by "any candidate or the chairperson of any party committee." R.I.G.L. § 17-14-11.

warned that the virus spreads from person-to-person primarily from close contact and that many of those infected, and thus contagious, have no symptoms." *Yanes v. Martin*, 2020 WL 3047515, at *3 (D.R.I. June 2, 2020). As a result, the Governor ordered vast sectors of the Rhode Island economy to be shut down, issued a stay-at-home order, and the imposition of "social distancing" measures to slow the virus' spread.

Although some restrictions in Rhode Island now have been relaxed, some sectors of the economy have been reopened, and the number of infections in the state has declined, current Rhode Island Department of Health regulations still require "social distancing" of six feet, and emphasize "minimiz[ing] the time of exposure to the extent possible." *See* RIDOH Reg. 216-RICR-50-15-7 (June 1, 2020). Additionally, due to the continued presence of the virus, certain groups who are susceptible to severe cases of the disease—namely, senior citizens and persons with preexisting medical conditions—must especially limit their direct contact with other persons.

### D. State Action To Date

To date the State has taken no impactful action to modify or suspend the nomination signature requirement in light of the ongoing pandemic. In the Rhode Island House of Representatives, a bill, H-7901-Sub A, was introduced, that sought to modify certain aspects of the signature requirement for federal offices but made no corresponding changes for state and local offices.[3] The Rhode Island Board of

---

[3] After the filing of this complaint on June 16, 2020, the Rhode Island House and Senate passed H-7901SubA on June 17th and 18th respectively. It was signed by the

Elections has discussed the issue on several recent occasions and has reported to this Court that it supports email signature gathering but opposes any of the other relief sought by the plaintiffs. The Rhode Island Secretary of State supports the remote signing of nomination papers (through email or other electronic submission) but does not have the authority to revise the nomination process. (ECF No. 1-1.)

### E. The Instant Litigation

Four of the six plaintiffs have attested that they, or a close family member residing with them, suffer from health conditions that would render soliciting nomination signatures from the public medically inadvisable. One other plaintiff is a registered nurse currently treating COVID-19 patients and must avoid contact with all persons outside of his workplace. The final plaintiff's district includes Rhode Island's community that has suffered the greatest COVID-19 impact, Central Falls.

As such, the plaintiffs assert that "the nomination process needlessly exposes candidates, their supporters, and the general public to risks associated with the COVID-19 pandemic with no justifiable countervailing interest." (ECF No 1 ¶ 36.) In support, the plaintiffs have filed affidavits from Michael Fine, M.D. and Konstantine Nicholas Tsiongas, M.D. Both doctors have opined that "[t]he current

---

governor on June 19, 2020. That bill, which originally sought to simply update the address for the Rhode Island Board of Elections, updated requirements for signatures for those seeking to run in primaries for congressional office. There is no indication in the record that either the R.I. House or Senate considered updating the requirements for local office seekers. The Court, therefore, finds that the argument set forth by the members of the North Providence Board of Canvassers regarding abstention is not persuasive.

'in person' signature solicitation and collection process as part of the candidate nomination process carries with it a high risk to the general public's health." (ECF Nos. 1-2 & 1-3.)

The plaintiffs therefore seek a declaratory judgment that the candidate nomination statutory scheme violates the First and Fourteenth Amendments to the United States Constitution "as applied" to the current COVID-19 pandemic and the 2020 election, insofar as the statutes create an unreasonable burden on qualification for candidates to appear on the ballot and fails to track a legitimate government interest, particularly where there are less onerous and much safer options available.

Given that timing is critical (completed nomination papers must be turned into the local boards of canvassers by July 10, 2020), the plaintiffs have filed an Emergency Motion for Injunctive Relief asking that this Court enjoin the defendants from enforcing the ballot nomination procedures contained in R.I.G.L. § 14-17-1, *et seq.* for the 2020 election cycle or lesser relief in the form of reduction of the number of signatures required or the suspension of the in-person signature and witnessing requirements.

The Rhode Island Board of Elections has voted to support the adoption of a remote signature requirement but has objected to any other changes and has argued that any change so close to the election would create extreme difficulties. In contrast, the Secretary of State supports the plaintiffs' pursuit; however, she asks that, for cybersecurity purposes, the nomination papers not be returned electronically to local

boards of canvassers and instead returned by any one of her proposed alternatives.[4] The Rhode Island Attorney General, too, agrees, at least in part, with the plaintiffs' position as do the members of the Central Falls, Providence, and Warwick Boards of Canvassers. The members of the North Providence Board of Canvassers, who objected to the plaintiffs' motion, have informed the Court as of today, that they do not oppose an alternative to in-person signature gathering but object to any other changes. The members of the Pawtucket Board of Canvassers, though notified of these proceedings, had not made an appearance by the time the Court heard argument on the plaintiffs' Motion.

## II. PRELIMINARY INJUNCTION STANDARD

"In determining whether to grant a preliminary injunction, the district court must consider: (i) the movant's likelihood of success on the merits of its claims; (ii) whether and to what extent the movant will suffer irreparable harm if the injunction is withheld; (iii) the balance of hardships as between the parties; and (iv) the effect, if any, that an injunction (or the withholding of one) may have on the public interest." *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 9 (1st Cir. 2013). The Court should not award the "extraordinary and drastic remedy" of a preliminary injunction unless the plaintiffs meets their burden of persuasion with "substantial proof." *See Marzurek v. Armstrong*, 520 U.S. 968, 972, 117 S. Ct. 1865, 138 L.Ed.2d 162 (1997).

---

[4] The Secretary of State proposes the following alternative methods of returning completed nomination papers: (1) in person; (2) in a "drop box" like those used for mail ballots in the 2020 Presidential Preference Primary; (3) via Regular or Express United States Mail; or (4) via facsimile. (ECF No. 19 at 2.)

### III. DISCUSSION

The Court is mindful that preliminary injunctive relief typically is issued to preserve the status quo and that what the plaintiffs seek here would in fact alter existing election laws. Such relief is known more specifically as a "mandatory injunction." Because a mandatory injunction may effectively grant the ultimate remedy the plaintiffs seek, such relief "should be granted only in those circumstances when the exigencies of the situation demand such relief"—when "the facts and the law clearly favor the moving party." *Harris v. Wall*, 217 F. Supp. 3d 541, 553 (D.R.I. 2016).

For the reasons expressed below, the Court finds that not only do the plaintiffs meet the four factors to warrant injunctive relief, but also that such exigencies exist that necessitate the drastic remedy of a mandatory injunction.

#### A. Likelihood Of Success On The Merits

The plaintiffs levy an "as applied" constitutional challenge to the statutory candidate nomination process, R.I.G.L. § 17-14-1 *et seq.* An "as applied" challenge requires a plaintiff "to demonstrate that the statute, as applied to his or her particular situation, violates" constitutional principles. *Hall v. INS*, 253 F. Supp. 2d 244, 248 (D.R.I. 2003). The constitutional principle at issue here is ballot access which draws upon two interrelated constitutional rights: "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968).

Only regulations that are both supported by compelling state interests and that do not unreasonably restrict ballot access are permissible. *Ill. State Bd. of Elections v. Socialist Worker Party*, 440 U.S. 173, 184 (1979). The burden is on the government to articulate a compelling state interest and manner by which the state pursues that interest. *Id.; American Party of Texas v. White*, 415 U.S. 767, 780-81 (1974). This Court previously has used a sliding scale to measure the level of scrutiny applicable to the determination of the constitutionality of election laws: "the lighter the burden, the more forgiving the scrutiny: the heavier the burden, the more exacting the review … if restrictions are severe, the burden is great, and the law must be drawn to advance a 'state interest of compelling importance.'" *Block v. Mollis*, 618 F. Supp. 2d 142, 149 (D.R.I. 2009) (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)).

As the objecting defendants correctly note, the U.S. Supreme Court has held that signature requirements to qualify for placement on a ballot are protective of "an important state interest" because they can demonstrate that a candidate has a "significant modicum of support' and will avoid "confusion, deception, and even frustration of the democratic process at the general election." *Jenness v. Fortson*, 403 U.S. 431, 442 (1971). *See also Munro v Socialist Workers Party*, 479 U.S. 189, 194 (1986) (holding "with unmistakable clarity that States have an 'undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot…'") (internal citation omitted).

While these precedents are instructive in normal times, the extraordinary circumstances under which we now live make them distinguishable. Because a

highly transmissible and potentially fatal illness still threatens the public health, social distancing measures, mask wearing, and limitation on the size of public gatherings are still mandated in Rhode Island. The plaintiffs are therefore correct that the in-person signature collection process will deter candidates and members of the public from engaging in that process. Supporters of those candidates will thus be denied their associational right to support a candidate of their choice, which will limit the ability of all voters to cast a meaningful ballot. *See Libertarian Party of Ky. v. Grimes*, 835 F. 3d 570, 574 (6th Cir. 2016) ("The hallmark of a severe burden is exclusion or virtual exclusion from the ballot.").

Furthermore, the plaintiffs here all have demonstrated to the satisfaction of the Court that, due to their own health condition, or of the condition of those around them, the signature collection process would jeopardize their health and that of the public. The objecting defendants have put forth no compelling reason that the signature process should exist in its current form during the pandemic. While they are correct that the rate of infection in Rhode Island has decreased from its peak, and that the state has begun its reopening process, these developments can be attributed to social distancing measures and the avoidance of the type of personal contact that the signature collection process requires. In fact, current CDC guidance urges people at higher risk for serious complications from COVID-19 to take steps to protect themselves including, staying home, and maintaining social distance. https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/what-you-can-do.html

Because of the pandemic, and the effect the in-person signature requirement will have on ballot access, the current signature process is not narrowly tailored to advance the state's interests. A state must utilize "the least drastic means" to achieve its electoral interests, with this tailoring requirement being "particularly important where restrictions on access to the ballot are involved." *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 185 (1979). Less restrictive means can, and should, be available during these extraordinary times. The Rhode Island Secretary of State has proposed a measure whereby voters can execute nominating petitions remotely through email, but the measure otherwise leaves the review and certification process the same. (ECF No. 1-1.) In this manner, the state's interest would be preserved but appropriately tailored to the exigencies of the day.

The Secretary of State also proposes several methods to return the completed nomination papers that involve little to no personal contact. Such measures, too, are sufficient to maintain the state's interest and properly address the plaintiffs' health-related concerns.

Therefore, the Court finds that the plaintiffs are likely to succeed on the merits of their "as applied" constitutional challenge to the statutory candidate nomination process.

### B. Irreparable Harm

The current in-person signature process unnecessarily burdens the plaintiffs' First Amendment rights. *See, e.g.*, *Williams v. Rhodes*, 393 U.S. at 30. It is well-settled that "loss of First Amendment freedoms, for even minimal periods of time,

unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 547 (1976). Therefore, the plaintiffs meet this factor.

### C. The Balance Of The Hardships

The balance of the hardships between the parties favors the plaintiffs. The signature collection process jeopardizes the plaintiffs' health unnecessarily when there are less restrictive means available. These less restrictive means—the ability to collect signatures electronically—will not unduly burden the defendants' interest in ensuring that the plaintiffs can demonstrate a "modicum of support" to justify their place on the ballot.

### D. The Public Interest

The public interest weighs in favor of a modification of the signature requirement. In-person signatures amid a pandemic, one comprised of a highly contagious virus transmitted through close human contact, actually would undermine the public interest. Moreover, "[w]hen a constitutional violation is likely," which the Court finds here, "the public interest militates in favor of injunctive relief because it is always in the public interest to prevent violation of a party's constitutional rights." *See ACLU Fund of Mich. V. Livingston Cty.*, 796 F.3d 636, 649 (6th Cir. 2015).

## IV.   CONCLUSION

For the foregoing reasons, the plaintiffs' Emergency Motion for Injunctive Relief (ECF No. 2) is GRANTED.

The Court hereby issues the following PRELIMINARY INJUNCTION:

1. The defendants shall allow the plaintiffs to email nomination papers to voters and to have the papers returned to the plaintiffs electronically. True electronic or scanned signatures from voters otherwise qualified under R.I.G.L. § 17-14-1 *et seq.* shall be acceptable.

2. The defendants shall allow the plaintiffs to return the completed nomination papers to the appropriate board of canvassers either in person; in a physical "drop box" such as that used for mail ballots in the 2020 Presidential Preference Primary; via Regular or Express United States Mail; or via facsimile.

3. This relief shall be in effect only for the 2020 candidate nomination process.

IT IS SO ORDERED.

_____
Mary S. McElroy
United States District Judge
June 25, 2020